IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ELOY HITA,

          Plaintiff,

vs.                                   No. CIV 05-1088 LFG/LCS

LYNDELL "MAX" STANSELL, Jr.,
TOMMY RICHBOURG,
RICHARD JOHNSON, and the
CITY OF CLOVIS, NEW MEXICO,

          Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment
[Doc. 22], filed herein July 13, 2006. Plaintiff filed his Response [Doc. 30] on September 11, 2006,
and Defendants filed a Reply [Doc. 34] on September 26, 2006. The Court determines that oral
argument is not necessary. For the reasons given below, the Motion is granted in part and denied in
part.

### Factual and Procedural Background

Plaintiff Eloy Hita ("Hita") brings suit under 42 U.S.C. § 1983 and various causes of action
under state law. Hita's claims against the three individual police officers are based on allegations that
he was wrongfully arrested and subjected to excessive force during the arrest, that his home was
entered illegally and searched illegally, and that he was maliciously prosecuted without probable cause

and on the basis of false information supplied by one of the officers. He also brings claims against the City of Clovis for municipal liability with respect to the alleged constitutional violations and for *respondeat superior* liability with respect to the state law claims, and against Defendant Richard Johnson for supervisory liability.

Defendants deny Plaintiff's allegations and raise various affirmative defenses, including qualified immunity.

## Procedural Background

Hita names four Defendants: Lyndell "Max" Stansell, Jr. ("Stansell") and Tommy Richbourg ("Richbourg"), both patrolmen with the City of Clovis Police Department at the time of the incident; Richard Johnson ("Johnson"), a sergeant with the City of Clovis Police Department; and the City of Clovis itself ("City"). All parties have consented to proceed before the undersigned Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b).

Earlier in the proceedings, Defendants Stansell, Johnson, and the City[1] filed a Motion for Judgment on the Pleadings and/or for Summary Judgment [Doc. 13] as to Plaintiff's cause of action for unreasonable search and seizure, contending that a ruling by the state district court should be afforded collateral estoppel effect. The Court rejected Defendants' collateral estoppel argument, noting however that the ruling "does not preclude Defendants from raising similar and other arguments for dismissal of the Fourth Amendment claim on a motion for summary judgment." [Doc. 20, at 14].

## Factual Background

The following factual summary is taken from Defendants' Statement of Undisputed Material

---

[1] Defendant Richbourg had not yet been served at the time.

2

Facts as set forth in their Motion for Summary Judgment, and Plaintiff's position on factual matters as set forth in his Response.

On October 18, 2003, at approximately 2:20 a.m., patrolman Stansell was dispatched to "the area just north of 813 Laurelwood" in Clovis, New Mexico to respond to a possible domestic disturbance in progress. Stansell was advised by the dispatch operator that the complaint involved a male and female who were "possibly fighting." When Stansell arrived in the area he asked neighbors about any fighting outside, and one of them identified 809C Laurelwood as the apartment where the feuding couple could be found. At the time, Hita and his wife lived at 809C Laurelwood Drive.

There is a small patio area outside the front door to the apartment. The patio is enclosed by a split cedar wooden fence with a gate. The only way to access the front door of the apartment is to enter through the wooden patio gate and proceed through the patio area to the front door. Thus, any visitor, delivery man, guest, or neighbor who wanted to see or speak to someone at the apartment would have to enter the yard via the cedar slat gate.

Stansell approached the gate and saw Hita open the front door to the apartment and step outside onto the patio area. Stansell shone his flashlight in Hita's direction and asked Hita to come over and talk, telling him the police had received a call about someone yelling outside. Hita refused to speak to Stansell and went back into the apartment. There is a dispute as to whether Hita yelled or cursed at Stansell, but Defendants contend it is immaterial and, for purposes of this Motion, they concede that Hita did not curse.

Stansell then went to speak to the neighbor, Tiffany Clewis, the person who had called the police about the incident. She confirmed that she heard a male and female yelling at each other

3

outside, next to a pickup truck.  Ms. Clewis told Stansell that she saw the female get into the truck and heard the male angrily say to the female, "you're not going anywhere with my baby."  After that discussion, Ms. Clewis said, the male went back into the apartment and the female followed shortly thereafter.  The apartment was the Hita apartment.

After talking to Ms. Clewis and ascertaining that there had been an angry encounter outside and that the male and female had entered the Hita apartment, Stansell went back to Hita's apartment and entered the patio area through the gate.  The gate was unlocked.  It was, however, closed and secured by a latch located on the inside.  Stansell could not figure out how to open the gate at first. Defendants assert that Stansell pulled on the gate and a cedar slat broke off, while Hita asserts that Stansell broke a board off the gate in order to gain access to the patio.  However, there is no dispute that Stansell pulled on the gate and that a board broke off.  Stansell then walked across the patio and knocked on Hita's front door.

Hita opened the interior wooden door to the apartment but kept a glass storm door closed. He spoke to Stansell through the glass door.  Hita told Stansell that he did not want to talk to him and said that Stansell was trespassing and that he would file charges against Stansell if he did not leave.  Defendants claim that Hita was agitated and yelling at this point; Hita denies that he ever yelled at Stansell.

Stansell advised Hita that he was under arrest for obstructing a police officer and ordered him to come out of the apartment.  Stansell states that Hita was extremely agitated and that he slammed the wooden door.  Hita denies that he was agitated or that he slammed the door; it is undisputed, however, that when Hita closed the door, one of the door's wood panels fell off.  Hita says this particular panel was loose and tended to fall off even with normal opening and closing of the door.

4

Faced with a neighbor's claims of an altercation and yelling, and a dispute potentially involving a child, and with Hita's refusal to talk with the officer, Stansell called for backup. Stansell asserts that he sought assistance based on his perception of Hita's "explosive behavior," on Hita's refusal to talk to the officer even after being informed he was under arrest, and on Stansell's concern for the welfare of the female in the apartment in light of the report about possible fighting, including the fact that an infant may have been present. Stansell continued to knock on the door and call to Hita to open the door in an effort to have Hita come out and talk, but Hita refused. Stansell says that he heard yelling within the house every few minutes and that, on a few occasions, he heard yelling from the upstairs area of the apartment.

Richbourg and Johnson arrived in response to the backup call. Johnson, a sergeant and the ranking officer at the scene, turned on his belt recorded and began attempting to speak with Hita. Thus, there is a tape of the entire encounter with Hita following Johnson's arrival. Although Hita opened the wooden door and spoke to the officers through the glass storm door, he refused to come out or unlock the storm door. Johnson asked to speak to Hita's wife to ensure that she was all right. Initially Hita refused, but after some yelling between Hita and his spouse, Hita allowed his wife, Suzanne Hita ("Suzanne") to come to the door, but she did not step outside. Suzanne appeared to the officers to be extremely scared and agitated. Johnson noted that when he was trying to speak to Suzanne, she looked at Hita and then at the doorknob as if she was considering coming out of the apartment, but when she moved close to the storm door Hita grabbed the handle and prevented Suzanne from opening the storm door. Suzanne looked at Hita before answering any of Johnson's questions. She seemed subdued and would not make eye contact with Johnson, but was focused on Hita. Johnson felt that her behavior was consistent with the behavior of a domestic violence victim.

Hita acknowledges that Suzanne was upset at the time but attributes Suzanne's emotional upheaval to the officers' conduct.

After several futile attempts to get Hita to come down and talk and to allow the officer to ensure that all was well, the officers called Hita's father and asked him to come to the residence. Hita, Sr. was the owner of the apartment. When the father arrived, Hita came to the front door to speak to him. Hita unlocked the storm door, and Richbourg then opened the door and stepped into the threshold of the apartment. Richbourg states that he opened the security door and entered the threshold in order to prevent Hita from barricading himself inside again.

Defendants assert that, at this point, Richbourg advised Hita that he was under arrest and told him to put his hands behind his back, but Hita refused to cooperate. Defendants further assert that Richbourg then took hold of Hita's left wrist, attempting to put him in handcuffs, but Hita tightened his muscles, struggled and attempted to pull away. During the struggle, Richbourg and Hita moved outside the apartment into the yard or patio area. Hita's description of this sequence of events is that Richbourg entered his apartment, grabbed him by the arm and pulled him outside.

Stansell saw Hita and Richbourg come out of the doorway of the apartment, struggling, and he went over to assist Richbourg. Richbourg then used an "arm bar leverage technique" to get Hita to the ground. Defendants state that Hita's father, who was standing nearby at this point, pleaded with Hita to calm down and not to resist the officers, and advised the officers that Hita had recently had a shoulder injury. Hita's description of these events is that Richbourgh tripped him and slung him face-first to the concrete sidewalk. Hita further contends that after he was thrown to the ground, Richbourg and Stansell "battered him while he was injured and restrained on the ground." The officers eventually were able to overcome the struggling Hita, pull his hands behind his back and

secure his wrists with handcuffs.

During the struggle, Johnson asked Hita's father to tell Hita that if he quit fighting with the officers there wouldn't be any problem. Hita, Sr. told Hita to "settle down," "don't fight them," and to "stop crying."

Hita complained of shoulder pain after the arrest, and Stansell took him to the hospital to be checked. A doctor examined Hita and diagnosed a shoulder strain and a thumb contusion. The doctor prescribed Ibuprofen and released Hita. Stansell then transported Hita to the Curry County Adult Detention Center for booking.

After Hita was arrested, Johnson interviewed Suzanne inside the apartment. She confirmed that Hita had been arguing with her and had grabbed her by the arm. She denied having any marks as a result of the argument, but Johnson observed red marks and scratches on her forearm and wrist. Suzanne stated that, when she came to the door to speak to Johnson, Hita was in front of her and telling her not to open the door. She felt she "couldn't really do much about it." She said that Hita would probably have been "really mad" at her if she had opened the door. Johnson provided Suzanne with information concerning assistance for domestic violence victims, including information on shelters. Suzanne stated that she was okay and asked for information on how to assist in bonding Hita out of jail. The information requested by Suzanne was provided.

Stansell swore out an Affidavit and Criminal Complaint charging Hita with one count of battery on a household member, one count of obstructing a police officer, and one count of resisting/evading a police officer. On January 28, 2004, Hita was convicted in Curry County Magistrate Court on one count of resisting, evading or obstructing an officer. Hita appealed his conviction to New Mexico District Court, Ninth Judicial District.

On September 17, 2004, Judge Joe Parker issued a letter decision on the appeal, in which he found:  (a) Stansell initiated contact with Hita on October 18, 2003 in response to complaints by neighbors and for the purpose of checking on "a person's welfare and to assist a person in need"; (b) although Stansell entered Hita's property, the nonconsensual warrantless intrusion was limited to the entry onto the patio and not the living quarters of the home; (c) when the officers met with Suzanne in the residence after Hita's arrest, Suzanne did not deem the meeting nonconsensual; and (d) the officers did not violate Hita's constitutional rights, nor was there an unreasonable search and seizure.

Despite these findings, Judge Parker overturned Hita's conviction on grounds that the jury acquitted Hita on the charge of resisting or abusing an officer but found Hita guilty of obstructing an officer, and that "obstructing an officer" as pled in the Criminal Complaint is not an offense made punishable by state statute.

## Discussion

As noted above, this Court declined to give collateral estoppel effect to Judge Joe Parker's finding that no unreasonable search and seizure occurred, but noted that Defendants were free to raise the issue anew in a Motion for Summary Judgment.  Defendants have done so and contend as well that all of Hita's claims are subject to summary judgment and that the individual defendants are entitled to qualified immunity on Hita's constitutional claims.

### Standards for Summary Judgment and Qualified Immunity

Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995).  The

8

party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).

Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996). The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment, nor will mere argument or contention of counsel suffice. Fed. R. Civ. P. 56(e);  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

"The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine.'" Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir. 1997). Summary judgment can be entered only if there is insufficient evidence for a reasonable jury to return a verdict for the party opposing the motion. Anderson, 477 U.S. at 249, 106 S. Ct. at 2511. Thus, the Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id., at 251-52, 106 S. Ct. at 2512. The Court in considering a motion for summary judgment construes the factual record and the reasonable inferences therefrom in the light most favorable to the party opposing the motion. Foster v. Alliedsignal, Inc., 293 F.3d 1187 (10th Cir. 2002).

A summary judgment motion asserting a qualified immunity defense is determined somewhat differently from other summary judgment motions.  When the defendant raises qualified immunity, the burdens shift as outlined in Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151 (2001).  First, the court must consider whether the factual record, taken in the light most favorable to the plaintiffs, demonstrates that the officer's conduct violated the constitution.  If no constitutional right would be violated if the plaintiff's allegations are established, then there is no necessity for further inquiries concerning qualified immunity, and summary judgment is appropriate.

If, however, a violation could be made out, the next step is to ask whether the right violated was "clearly established" in a particularized sense.  In determining whether a right was clearly established at the time of the alleged injury, the relevant inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  Summary judgment based on qualified immunity is appropriate if the law did not put the officer on notice that his conduct would be clearly unlawful.  Id., 533 U.S. at 201-02; Cortez v. McCauley,438 F.3d 980, 988 (10th Cir. 2006).

Requiring the law to be clearly established provides defendants with "fair warning" that their conduct is unconstitutional.  Harman v. Pollock, 446 F.3d 1069, 1077 (10th Cir. 2006).  The law is "clearly established" when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows a reasonable officer would understand that what he is doing violates the plaintiff's rights.  Id..

If the plaintiff establishes both elements of the test – that is, a constitutional violation and "clearly established" law – then the defendant bears the traditional of burden of showing that no material issues of fact remain that would defeat the claim of qualified immunity.  Romero v. Fay, 45

10

F.3d 1472, 1475 (10th Cir. 1995).

Qualified immunity "grants 'officers immunity for reasonable mistakes as to the legality of their actions . . . .  The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct."  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1196 (10th Cir. 2001).  If an officer makes a reasonable mistake as to what the law requires, then he is entitled to the immunity defense.  However, summary judgment on qualified immunity grounds is only appropriate in the absence of disputed facts that are material to a determination of reasonableness.  Medina v. Cram, 252 F.3d 1124, 1131 (10th Cir. 2001).

The Court will address the propriety of summary judgment separately as to each of Plaintiff's causes of action.

<u>First Cause of Action: Unreasonable Search and Seizure</u>

Hita alleges for his First Cause of Action that he had a reasonable expectation of privacy in his home and in the protected curtilage area of his home, and that the defendant officers violated his Fourth and Fourteenth Amendment rights against unreasonable searches and seizures when they conducted a warrantless, non-consensual entry into, first the patio, then the apartment itself.  He claims he "enjoyed an absolute right to engage or not engage in communications with police officers" in these areas.  [Complaint, Doc. 1, at ¶ 42].[2]

---

[2]In his First Cause of Action, as well as in other Causes of Action, Hita asserts claims under both federal and state constitutions.  In New Mexico, if the right asserted is protected under the federal constitution, then a claim asserted under an analogous provision of the state constitution need not be reached.  State v. Gomez, 122 N.M. 777, 783-84, 932 P.2d 1, 7-8 (1997).  Hita raises no argument that the New Mexico constitutional provision on which he relies in his Complaint provides any broader protection than the analogous federal provisions; therefore, the Court's analysis is directed solely at Hita's federal constitutional claim.  Id.,122 N.M. at 784.  Thus, the Court's ruling on the federal constitutional claims is dispositive of Hita's state constitutional claims as well.

11

Hita contends further that his constitutional rights were violated in that the officers arrested him without a warrant, without probable cause and without exigent circumstances. Finally, he asserts that the officers unconstitutionally searched his home without justification, consent, or a warrant, and without probable cause or exigent circumstances. He cites Defendant Johnson, the ranking officer at the scene, for supervisory liability and the City for municipal liability, alleging that Johnson failed to adequately train and supervise his subordinate officers and that these failures reflected the customs and policies of the Defendant City. [Complaint, Doc. 1, at ¶¶ 43-45].

Defendants counter that the officers' entry into the patio area, as well as into the apartment itself, was objectively reasonable and did not violate Hita's constitutional rights. In addition, they contend that they had probable cause to arrest Hita, based on information they had from witnesses and from their own perceptions in their encounter with Hita on the night in question. Finally, they assert that their post-arrest entry into and search of Hita's apartment to ascertain the safety of others, including a child, did not violate his constitutional rights.

A.  Initial Entry Onto Hita's Property

The facts relevant to this claim are as follows:

Stansell was the first police officer to have contact with Hita on the night in question. He responded to a report at 2:20 a.m. that a man and a woman in the neighborhood were "possibly fighting." When he arrived in the area neighbors directed him to Hita's apartment, the front door and patio of which were enclosed by a fence with a gate. Stansell approached the gate and saw Hita open his front door and step out in to the patio area. He shined his flashlight at Hita and asked him to come over and talk. Hita refused to speak to Stansell, went back into the apartment, and closed his door.

At this point, Stansell left Hita's yard and went to speak to the person who had reported the incident. She told him that she had seen a man and woman fighting outside the apartment, that the female got into a pickup truck, that the man told the woman, "you're not going anywhere with my baby," and that the male then went into the Hita apartment and the female followed him.

With this information provided by the neighbor, and out of concern for the safety of the parties, and potentially a child, Stansell then went back to Hita's apartment. The only route to the front door of the apartment was through the gate and across the enclosed patio area, and Stansell took this route. The gate was latched but not locked, and Stansell initially couldn't figure out how to open it. In the process of entering the patio, he broke a board off the gate. He stepped to the front door and knocked.

Hita opened the interior wooden door but kept the glass storm door closed and spoke to Stansell through the glass. Hita told Stansell he didn't want to talk to him and said Stansell was trespassing and that he would file charges against him if he didn't leave. At this point, Stansell advised Hita that he was investigating a complaint about a fight, that he wanted to talk to the woman and that Hita was interfering with the investigation. He told Hita that he was under arrest for obstructing a police officer and ordered Hita to come out of the apartment. Hita responded by slamming the wooden door, a piece of which fell off.

Hita alleges that he had a constitutional right to refuse to speak with a police officer, in his own home. He argues that he was simply exercising his right to be left alone. Defendants counter that they had information which led them reasonably to believe that a woman had been threatened by Hita and that she may be in danger, and their intrusion into the curtilage of Hita's home was therefore reasonable and justified under the Fourth Amendment.

13

At this point, Stansell had information that a man had argued with a woman on the street loudly enough that a neighbor heard the quarrel and called the police.  He knew that a neighbor reported that the man told the woman, "you're not going anywhere with my baby," and that the man and woman thereafter entered the Hita apartment.  He knew that the man inside that apartment refused to talk to him and told him he would press charges if Stansell didn't leave.

The Court finds that Stansell's actions in entering the patio area, which was the only route to the front door, were reasonable as a matter of law.[3]

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., amend. IV. The home is entitled to the greatest Fourth Amendment protection.  However, "the Supreme Court has repeatedly recognized that only unreasonable searches are proscribed." United States v. Najar, 451 F.3d 710, 713 (10th Cir. 2006).  While warrantless searches and seizures inside a home are presumptively unreasonable, Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380 (1980), "the presumption is not absolute.  'When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [Supreme] Court has found that certain

---

[3]An incident occurring in Albuquerque, New Mexico within the recent past shows the harm that can befall a domestic violence victim when a police investigation does not occur.

Media reports disclose a 911 call by a neighbor who reported a heated argument between a pregnant woman and her boyfriend. The police did not respond, because calls from one other than the victim were not afforded a "priority" classification.  The neighbor made a second 911 call when the tenor of the argument increased, again expressing concern over the increasingly angry altercation and asking for police assistance.  Again, the police did not respond.

The neighbor placed a third call, pleading for police assistance due to the fight.  There was no response until the neighbor reported hearing gun shots.  By the time the police arrived, both the man and the pregnant woman were dead of an apparent murder/suicide.

http://www.abqjournal.com/new/met (July 12, 2006).

general, or individual, circumstances may render a warrantless search or seizure reasonable.'" <u>Najar</u>, *supra*, at 713, *quoting from* <u>Illinois v. McArthur</u>, 531 U.S. 326, 330, 121 S. Ct. 946 (2001).

Hita alleges that the Defendant police officers violated his Fourth Amendment right when they entered the patio area.   The patio area can properly be deemed part of the "curtilage" of Hita's residence.  The curtilage of a house is "the area so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection." <u>United States v. Cavely</u>, 318 F.3d 987, 993 (10th Cir. 2003).  It is protected as part of the "area that harbors the intimate activity associated with the sanctity of a man's home and the privacies of life.  [Internal punctuation omitted]." <u>Id.</u>, *quoting from* <u>United States v. Dunn</u>, 480 U.S. 294, 300, 107 S. Ct. 1134 (1987).

The Court finds that Hita has made the requisite showing that he maintained a legitimate expectation of privacy in the patio area, and that it was part of the "curtilage."  Factors to be considered include the proximity of the area to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. <u>Cavely</u>, *supra*, at 993-94.

It is undisputed that the patio area was immediately adjacent to the front door of the apartment, and that there was a high fence around the patio which shielded the front door from the view of passers-by.  Furthermore, Hita states in his Affidavit that throughout the time he lived at that address, only invited guests had access to the patio area and the front door of the apartment.  No service workers required access to the patio area or to the front door.  When the gate to the patio was closed and latched, the patio area provided a secure play area for his child.  [Affidavit of Eloy Hita, at ¶ 4, attachment to Doc. 22].

However, it is clear from the record that while Hita had some expectation of privacy in the

patio area, it was nevertheless a "plac[e] visitors could be expected to go (e.g., walkways, driveways, porches)." United States v. Hatfield, 333 F.3d 1189, 1194 (10th Cir. 2003).  It was the only access from the public street to Hita's front door.  Any delivery person with a package, any neighbor that wanted to visit, any family member coming for dinner or friend bringing a child over to play, would, of necessity, have to enter the gate to approach and knock on the door.  Although the gate into the area was latched, it was not locked.  There were no signs prohibiting entry or warning visitors away. The only way to get to the front door of the apartment was through the gate and across the patio, and this route constituted the "principal means of access to the dwelling," United States v. Thomas, 120 F.3d 564, 571 (5th Cir. 1997), and thus the occupants had a diminished expectation of privacy in that area.  United States v. Titemore, 437 F.3d 251, 252, 258-59 (10th Cir. 2006) ("Because the trooper approached a principal entrance to the home using a route that other visitors could be expected to take, we hold that the trooper's actions did not violate the Fourth Amendment . . . .  [T]he portion of the curtilage that is used as a normal route of access for anyone visiting the premises is only a semi-private area" [internal punctuation omitted]).

Stansell's initial purpose in entering the patio area was to access the front door in order to speak to Hita and to ensure that the woman with whom he had been arguing was not in any danger. In addition, there was a report that a baby was present at the scene, who may well have been the subject of the argument which prompted the call to police.  It was eminently reasonable for Stansell to approach the door to the apartment and ask to speak to the man and woman who were reported to be fighting, and, from a public-safety standpoint, ensure that the woman and child were not in any danger.

The Court finds no issue of fact as to the reasonableness of Stansell's actions.  It was entirely

reasonable and proper for the police to investigate and ensure no one was in danger.  The patio, even

if curtilage, carried a diminished expectation of privacy.  In addition, the intrusion was justified by

exigent circumstances which justified the warrantless entry.  As Defendants point out, a police officer

has a statutory duty "to investigate all violations of the criminal laws of the state which are called to

the attention of any such officer or of which he is aware."  N.M.S.A. (1978) § 29-1-1.  While there

is no special exception to the warrant requirement simply because the circumstances involved a

domestic disturbance call, United States v. Davis, 290 F.3d 1239, 1244 (10th Cir. 2002), there were

sufficient exigent circumstances to justify Stansell's approach to the front door through the enclosed

patio area.

        At this point, Stansell knew that a man and woman had been fighting outside, that the man

made a statement that could be interpreted as a threat and which involved a baby, that the feuding pair

later entered the apartment, and that the man whom Stansell initially encountered in the patio and who

had emerged from the apartment was angry, uncooperative, refused to speak with him and threatened

legal action if he did not leave.  After this initial encounter, Stansell interviewed a neighbor who

confirmed the information received in the dispatch call.

        Under these circumstances, a reasonable officer faced with this information would have done

exactly what Stansell did.  He had a duty to investigate the report of possible domestic violence, and

the Court finds as a matter of law that exigent circumstances existed which justified the warrantless

intrusion into the patio.

        B.  Entry into Threshold of the Apartment and the Arrest

        Hita argues next that the officers violated his constitutional rights when they entered his

apartment and arrested him.  The facts relevant to this claim are as follows:

After Hita slammed the door on the officer, Stansell began to ring the doorbell and knock on the door in an attempt to have Hita come outside so he could complete his investigation into the "possible domestic situation." [Doc. 22, Ex. 1].  He also called for backup, and Defendants Johnson and Richbourg, and other officers, thereafter arrived on the scene.  Stansell stated in his incident report that Hita was very agitated, that every few minutes he heard Hita curse and yell, and that at one point he saw Hita in an upstairs window making an obscene gesture toward the officers.

Hita denies that he yelled or cursed at the officers.  It is undisputed, however, that he refused to come out of the apartment and continued to resist the officers' requests that he come out, talk to them, and allow them to speak to his wife outside Hita's presence.  At this point, Stansell does not know if Hita is intoxicated, armed, or posing a clear danger to himself or others.  He does know that there has been an argument at least loud and troubling enough to cause a neighbor to call the police.  He knows that Hita is agitated, angry and acting unreasonably.  He knows that a woman and perhaps a child could be at risk.  He knows that Hita is refusing a reasonable request that could easily resolve the situation.

When Johnson arrived on the scene, he turned on his belt tape and attempted numerous times, over a period of approximately an hour, to speak to Hita and to have him come outside.  During this period, Hita would open the wooden door and speak to officers, but he refused to come out or to unlock the storm door.  Johnson asked to speak to Hita's wife to ensure that she was all right.  It was only after significant prodding that Hita finally allowed Suzanne to come to the door, but he would not let her step outside.

The belt tape makes clear that, throughout the encounter, Johnson's voice was calm and firm.  Johnson asked repeatedly that Hita come out and talk to the officers.  Hita alleges that he was not

agitated, but the belt tape belies this statement.  He repeatedly refuses to speak with the officers about the circumstances leading up to the neighbor's call to police; he tells his wife to come to door but then will not allow her to go outside; and he threatens the officers with legal action.  He repeatedly states that he knows his rights and taunts the officers.  [Doc. 22, Ex. 8].

The officers stated that when they saw and spoke with Suzanne through the storm door, Hita was present at all times, and that when she moved close to the door Hita grabbed the handle and prevented her from opening the door.  She appeared to the officers to be extremely scared and agitated and looked at Hita before answering any of their questions.  She seemed subdued and would not make eye contact with the officer.  Johnson said this behavior was consistent with that of a domestic abuse victim.  The officers felt that Hita was preventing her from coming outside, and Suzanne confirmed in an interview following Hita's arrest that Hita stood between her and the door, did not allow her to open the door, and would have been angry if she had gone outside.

At any point in this period of confrontation, Hita could have defused the situation by simply going outside and talking to the officers, and allowing them to speak with his wife in a neutral setting. He consistently refused to do these things.  The tape reveals Johnson telling him continually that the police just wanted to ensure that everyone was all right and that they would leave once they were allowed to do their jobs.  Hita's only response was belligerent assertion of his right not to talk to them, and threats to sue if they did not leave.

At Hita's suggestion, the police officers called Hita's father.  When Hita, Sr. arrived, Hita unlocked the storm door.  Richbourg, who had posted himself near the front door, stepped onto the threshold and advised Hita that he was under arrest.  Richbourg says that he made this entry in order to prevent Hita from barricading himself inside again.  Hita was grabbed by the wrist, but he struggled

and sought to free himself.  Hita and Richbourg struggled in the entryway and eventually emerged from the front door, still engaged in a scuffle.  Eventually the officers were able to subdue Hita on the ground and handcuff him.

Hita alleges that the officers' actions in entering his apartment violated his constitutional right to be from unreasonable searches, and the arrest violated his right to be from unreasonable seizures.

        1.  <u>The Entry</u>

As noted above, searches and seizures inside a home without a warrant are presumptively unreasonable.  <u>Payton v. New York</u>, *supra*, 445 U.S. at 586.  An exception to the warrant requirement exists, however, in the case of a "plausible claim of specially pressing or urgent law enforcement need, *i.e.*, 'exigent circumstances'. . . [assuming that] the restraint at issue was tailored to that need, being limited in time and scope . . . and avoiding significant intrusion into the home itself."  <u>Illinois v. McArthur</u>, *supra*, 531 U.S. at 331.

In assessing whether exigent circumstances are present which permit a warrantless entry, the Court must "evaluate the circumstances as they would have appeared to prudent, cautious and trained officers . . . .  [The] determination ultimately depends on the unique facts of each controversy."  <u>United States v. Parra</u>, 2 F.3d 1058, 1064 (10th Cir. 1993) (internal punctuation omitted).

At the point when Richbourg stepped into the threshold to arrest Hita, the officers were concerned with both restraining him, and with ensuring that a possible domestic violence victim was unharmed and not in any danger.  "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."  <u>Mincey v. Arizona</u>, 437 U.S. 385, 392, 98 S. Ct. 2408, 2413 (1978).

The Court finds that the officers in this instance reasonably believed that Suzanne Hita might

be in danger of domestic abuse, based on the report of a loud quarrel outdoors in the early hours of the morning, a report of language from Hita toward his wife which could be construed as threatening, the possible presence of a baby at the scene, Hita's unexplained and unreasonable refusal to respond to the officers' requests that he come outside and allow them to talk to his wife in private, his refusal to allow Suzanne to leave the apartment, and Suzanne's demeanor at the scene which Johnson felt was consistent with that of a domestic abuse victim.

Hita asserts that the fact that Suzanne came to the door on more than one occasion and told the officers that she was all right demonstrates that the officers' actions were unreasonable. However, Hita would not allow Suzanne to come out and speak to the officers on her own. Police officers called to the scene of possible criminal activity are not obliged to credit reassuring statements of the purported victim and thereafter abandon the investigation without satisfying themselves that the person is, in fact, uninjured and safe from further harm. "That is why we give great latitude to police officers when presented with domestic disturbance scenarios." Phillips v. James, 422 F.3d 1075, 1082 (10th Cir. 2005). "The Fourth Amendment does not require police to be so credulous." United States v. Johnson, 364 F.3d 1185, 1192 (10th Cir. 2004).

The Court finds as a matter of law that, under all of the circumstances, Richbourg's entry into the apartment at the point that Hita unlocked the door was justified under the "exigent circumstances" exception to the warrant requirement. Hita's behavior throughout the encounter up to this point was resistant and obstructive, and the entry was necessary to prevent Hita from doing what a reasonable officer under the circumstances would have expected him to do, that is, to barricade himself inside again. Furthermore, Richbourg did not intrude into the apartment any farther than was necessary to reach Hita and attempt to secure him.

21

2. <u>The Arrest</u>

A police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if he makes a warrantless arrest without probable cause.  <u>Olsen v. Layton Hills Mall</u>, 312 F.3d 1304, 1312 (10th Cir. 2002), *citing* <u>Tennessee v. Garner</u>, 471 U.S. 1, 7, 105 S. Ct. 1694 (1985).  Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.  <u>Romero v. Fay</u>, 45 F.3d 1472, 1476 (10th Cir. 1995).  "The primary concern is whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer.  [Internal punctuation omitted]."  <u>Olsen v. Layton Hills Mall</u>, *supra*, at 1312.

In an action under § 1983 involving a warrantless arrest, the court must grant a police officer qualified immunity if a reasonable officer could have believed that probable cause existed to arrest the plaintiff.  <u>Romero v. Fay</u>, *supra*, at 1476.  However, when there are unresolved disputes of fact relevant to whether the officer acted reasonably, summary judgment on qualified immunity grounds is not appropriate.  <u>Farmer v. Perrill</u>, 288 F.3d 1254 (10th Cir. 2002).

Defendants contend that the officers in this case had probable cause to believe that assault or battery against a household member was occurring or was about to occur.  Assault against a household member is defined as "(1) an attempt to commit a battery against a household member; or (2) any unlawful act, threat or menacing conduct that causes a household member to reasonably believe that he is in danger of receiving an immediate battery."   N.M.S.A. (1978) § 30-3-12(A).  Battery against a household member is defined as "the unlawful, intentional touching or application of force to the person of a household member, when done in a rude, insolent or angry manner."

N.M.S.A. (1978) § 30-3-15(A).  These statutes were in force, in the above-quoted versions, at the time of the incident in October 2003.

Defendants further contend that they had probable cause to believe that Hita committed the offense of "resisting, evading or obstructing an officer."  That crime is defined as "intentionally fleeing, attempting to evade or evading an officer of this state when the person committing the act of fleeing, attempting to evade or evasion has knowledge that the officer is attempting to apprehend or arrest him"; or "resisting or abusing any judge, magistrate or peace officer in the lawful discharge of his duties."  N.M.S.A. (1978) § 30-22-1(B), (D). Again, this statute was in force, in the above-quoted version, at the time of the incident in October 2003.

There is no dispute that Hita refused to comply with the reasonable requests of Stansell and Johnson.  Both before and after he was informed him that he was under arrest, he remained inside his apartment and refused all requests and demands that he come outside and speak with the officers. He would not permit the officers to speak to his wife outside of his presence, and although they were able to see her and speak to her through the glass door, Hita grabbed the door handle when she approached it, and the officers felt her demeanor and behavior were consistent with that of a battered spouse.

As was true in Phillips v. James, *supra*, at 1084 & n.5:

> From the beginning Mr. Phillips' actions were unreasonable.  He had the power to defuse the situation by coming out of his bedroom and talking to the officers to allow them to reasonably assess the situation . . . .  Although Mr. Phillips was willing to talk to some extent with the officers through his bedroom door, the officers were reasonable . . . in their insistence that they communicate face-to-face in order to appropriately assess the situation in light of the purpose for which they were there.  *See*, Hiibel, 124 S. Ct. at 2458 (recognizing the wide latitude officers have in responding to domestic disturbance calls).

23

Defendants in this case were justified in their reasonable belief that they had probable cause to arrest Hita, and the Court finds as a matter of law that they did not violate his constitutional rights when they initiated the arrest at the threshold of the apartment.  The fact that Hita was later found not guilty on two counts and that his conviction on the remaining count was overturned on appeal does not undermine this finding.  The results of later criminal proceedings are not relevant in determining whether police officers on the scene had probable cause to make a warrantless arrest, as that determination is to be made in light of the facts confronting the officer at the time of the arrest. Summers v. Utah, 927 F.2d 1165, 1166-67 (10th Cir. 1991).  "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted – indeed, for every suspect released."  Pino v. Higgs, 75 F.3d 1461 (10th Cir. 1996).

The first prong of the qualified immunity analysis results in a finding  that the factual record, even taken in the light most favorable to the plaintiff, demonstrates that the officers' conduct in the entry and arrest did not violate the constitution.  There is thus no necessity for further inquiries concerning qualified immunity, and summary judgment is appropriate on this claim.

C.  The Post-Arrest Search of the Apartment

Hita also claims under the First Cause of Action for unreasonable search and seizure that following the arrest, the officers "conducted a full-scale entry and search of the home of Eloy Hita, entering the most intimate recesses of his home, without justification, without consent, without a warrant and without probable cause or exigent circumstances."  [Complaint, Doc. 1, at ¶ 43].

However, there is no evidence on the record that the officers conducted a post-arrest search of any sort in Hita's home.  After Stansell took Hita away, Richbourg and Johnson interviewed

Suzanne inside the apartment.  She told them that Hita grabbed her by the wrist when they were arguing earlier.  The officers observed some marks and scratches on her arm and wrist, and she confirmed that the marks were caused when Hita grabbed her.  [Doc. 22, Ex. 1].  There is nothing in any of the officers' reports, or anywhere else on the record, to indicate that a search of the apartment was conducted, nor is there any allegation or indication that the interview with Suzanne in the apartment after the arrest was non-consensual.

Summary judgment will be granted on the claim of an unreasonable search of the apartment.

<u>Second Cause of Action: Municipal Liability for Civil Rights Violations</u>

Hita's Second Cause of Action is directed toward the City.  He contends that:

> Defendant City of Clovis, has demonstrated deliberate indifference to the conduct of its police officers and police officers supervisors in these sort of circumstances, creating an environment wherein police officers are encouraged routinely to arrest citizens for "obstruction,' when in fact no criminal act has taken place.  Defendant City of Clovis has demonstrated a deliberate indifference to the inadequate training, supervision and discipline of its police officers, and police officers supervisors, with respect to the limits of their authority and the Constitutional prohibitions against warrantless entry into the homes of citizens, warrantless arrest, and the arrest of citizens without probable cause.

[Complaint, ¶ 48].

It is well-settled that a municipality cannot be held liable for constitutional violations by its employees under a theory of respondeat superior; rather, the City's liability in an action under § 1983 can be based only on its own unconstitutional or illegal policies or customs.  <u>Monell v. Dept. of Soc. Services</u>, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978); <u>Wilson v. Meeks</u>, 98 F.3d 1247, 1255 (10th Cir. 1996).

Here, Hita alleges that the City's policy of inadequate training, supervision and discipline with

respect to search and seizure techniques, and arrests for "obstruction," proximately caused the deprivation of his constitutional rights.  However, a municipality may not be held liable where there was no underlying constitutional violation by any of its officers.  Hinton v. City of Elmwood, 997 F.2d 774, 782 (10th Cir. 1993); Wilson v. Meeks, *supra*, at 1255.

As discussed above, the Court finds no genuine issue of fact regarding Hita's allegation of constitutional violations with respect to search and seizure or the warrantless arrest.   And, as discussed below, the Court finds as a matter of law that no constitutional violation occurred with respect to alleged false statements and claims of "obstruction."   As these are the only bases alleged by Hita in support of its municipal liability claim, summary judgment is appropriate on the Second Cause of Action.[4]

Third Cause of Action:  Excessive Use of Force

In his Third Cause of Action, Hita alleges that Defendant Richbourg forced his way into Hita's home and forcibly removed him outside to the patio area where Richbourg utilized a slashing leg whip maneuver, tripping Hita and slinging him face-first onto the concrete.  Hita alleges further that, after he was thrown to the ground, Richbourg and Stansell continued to batter him while he was injured and after he was restrained on the ground, despite pleas from his father and brother-in-law to stop.

Hita further alleges that when his brother-in-law complained to officers about the ill treatment accorded Hita, the officers told him to shut up or he would be next.  Hita claims he sustained injuries to his head, hand, arms, shoulders and legs as a result of the beating.  This treatment, he alleges,

---

[4]As discussed below, Hita's complaint includes no allegation of municipal liability for a policy, or a failure to train or supervise, with respect to excessive force.

constituted excessive and unreasonable force in violation of his rights under the Fourth and Fourteenth Amendments to the Constitution, as well as under the New Mexico Constitution.[5] [Complaint, Doc. 1, at ¶¶ 27-30, 51-53].

Defendants Richbourg and Stansell move for summary judgment on this claim. They assert that they reasonably believed that Hita may have committed, or was going to commit, a battery upon his wife. In addition, they assert that Hita was resisting arrest and refusing their reasonable requests to come out of the apartment and cooperate with the officers.

They do not deny that they brought Hita to the ground and handcuffed him, but they assert that the amount of force used in effecting Hita's arrest was reasonable and commensurate with the resistance offered by Hita and that their conduct did not violate the Fourth Amendment. Defendants argue that there are no material issues of fact with respect to whether their actions were objectively reasonable. In the alternative, they assert qualified immunity in that Hita failed to demonstrate violation of a clearly established constitutional right.

In the discussion of the First Cause of Action, the Court determined as a matter of law that Defendants had probable cause to arrest Hita and did not violate his right to be free from unreasonable search and seizure in effecting the arrest. However, Hita may still maintain an independent claim that he was subjected to excessive force during an otherwise lawful arrest. Cortez v. McCauley, *supra*, at 996 ("Once summary judgment is granted in the officer's favor on the wrongful arrest claim, the plaintiff's claim that the officer used excessive force must be analyzed independently" [internal punctuation omitted]).

The right to be free from police use of excessive force arises under the Fourth Amendment's

---

[5]As discussed above, the Court does not consider Hita's claims under the state constitution.

prohibition against unreasonable seizures of the person.  Graham v. Connor, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871 (1989).  The right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof in order to effect it.  Id., 490 U.S. at 396.

The proper application of the test of reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight . . . .  [T]he question is whether the totality of the circumstances justifies a particular sort of seizure."  Id. (internal punctuation omitted).

The reasonableness of a particular use of force must be judged from the perspective of the officer on the scene, rather than with hindsight; it is "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," that violates the Fourth Amendment.  Id.. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  Id., 490 U.S. at 396-97.  The question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying motivation.

As noted above, even if a defendant officer's actions are not objectively unreasonable, he may still be entitled to qualified immunity on a claim of excessive force.  "Qualified immunity operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force,' . . . and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier v. Katz, supra, 533 U.S. at 206.

The concern of the qualified immunity inquiry is to acknowledge that

> reasonable mistakes can be made as to the legal constraints on particular police conduct.  It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense . . . .  The question is what the officer reasonably understood his powers and responsibilities to be, when he acted, under clearly established standards.

Id., 533 U.S. at 205, 208.

Thus, qualified immunity can apply in excessive force cases if an officer operates under a mistaken belief as to the legality of his actions, so long as the belief was reasonable.  Id., 533 U.S. at 205; Holland ex rel Overdorff v. Harrington, supra, at 1196.

As noted above, the burden of proof shifts when a defendant raises qualified immunity on a summary judgment motion.  The plaintiff must show that the facts indicate that defendants violated his constitutional rights, and that the right was clearly established.  If plaintiff establishes both elements, then defendant bears the traditional burden of demonstrating that no material issues of fact remain that would defeat the claim of qualified immunity.  "Specifically, the public official must show that no material issues of fact remain as to whether his or her actions were 'objectively reasonable in light of the law and the information he or she possessed at the time.'"  Hinton v. City of Elwood, supra, at 779.

While plaintiff bears a heavy burden in resisting a qualified immunity defense, qualified immunity is not equivalent to absolute immunity.  In excessive force cases, summary judgment is not appropriate when there are facts in dispute that are material to a determination of reasonableness.  "[A] contested issue of fact that is material to the qualified immunity analysis gives rise to a jury

29

question." Maestas v. Lujan, 351 F.3d 1001, 1008 (10th Cir. 2003).  While stating that the question "[w]hether officers acted reasonably . . . is a *legal* determination in the absence of disputed material facts [emphasis in original]," the Tenth Circuit noted nevertheless that "the reasonableness standard is inevitably fact dependent" and that if the facts are in dispute, the dispute cannot be resolved by the Court at the summary judgment stage; rather, it must be resolved by a jury.  Medina v. Cram, *supra*, at 1131.

> [T]his court will not approve summary judgment in excessive force cases – based on qualified immunity or otherwise – if the moving party has not quieted all disputed issues of material fact . . . .  [S]ummary judgment motions may not be granted on any excessive force claims under § 1983 for which *any* genuine issue of material fact remains – regardless of whether the potential grant would arise from qualified immunity or from a showing that the officer merely had not committed a constitutional violation . . . .  [M]aterial factual disputes involving the immediate connection of an officer's use of force in response to a suspect's threat of force prevent a court from granting summary judgment . . . .  Where a disputed issue of material fact remains, that ends the matter for summary judgment. [Emphasis in original; internal punctuation omitted].

Olsen v. Layton Hills Mall, *supra*, at 1314-15.

In the present case, there are factual disputes as to exactly what occurred at the point that Hita was removed from the doorway, brought to the ground and placed in handcuffs, and as to what happened after he was subdued.  These disputes are material to the determination of reasonableness. The Court therefore finds that summary judgment is not appropriate on Hita's claim of excessive force.

As noted above, Hita's erratic and resistant behavior on the night of the arrest, together with the information the officers obtained from neighbors who witnessed the argument between Hita and his wife, constituted sufficient grounds for the entry and arrest.  It is not clear, however, exactly what

occurred after Hita's father appeared on the scene and Hita finally opened his front door.

Hita claims that Richbourg was hiding in the bushes near the door, and as soon as he opened it, Richbourg came forward, stepped inside his apartment, grabbed him by the arm and pulled him outside.  Defendants do not dispute that Richbourg entered at least the threshold of the apartment and that he and Hita emerged together out to the patio area.

Hita portrays the arrest procedure in much more violent terms than do the Defendants.  He says that Richbourg came into his house and pulled him out, tripped and "slammed" him face down onto the concrete patio.  He alleges that several other officers, including defendant Stansell "joined in" and, while he was still on the ground, "continued to batter me."  He says that one officer dug his thumb into the fleshy part of Hita's left hand and pulled his hands up behind his back to handcuff him. He says he sustained abrasions on his knees, elbows and forehead, scratches and bruises on his arms and a fingernail wound and swelling on his left hand between the thumb and index finger.  [Affidavit of Eloy Hita, attachment to Doc. 30, at 3].

In his deposition, Hita states that the officers made no effort to handcuff him while he was standing up; rather, they "threw" him to the floor before attempting to handcuff him, and wrenched his arm behind him in spite of his pleas to stop.  He states that he wasn't fighting with the officers but was just telling them his arm was hurting.  [Doc. 22, Ex. 3].

Defendants' version of the incident is somewhat different.  In his Supplemental Report of the incident, Richbourg states that Hita demanded that the police officers call his father and refused to come out until his father got there.  Richbourg says further that he remained positioned at the front door until Hita's father arrived and, when Hita unlocked the security door, Richbourg immediately opened the door and entered the threshold to prevent Hita's barricading himself inside again.  He told

Hita he was under arrest and ordered him to put his hands behind his back, but instead Hita began backing up.  As he was attempting to handcuff Hita, Hita "tightened his muscles," refusing to put his hands behind his back.  At this point, Richbourg says, he pulled Hita outside and the struggle continued.  [Doc. 22, Ex. 7]

Richbourg says that he told Hita several times to stop resisting.  Richbourg says he used an "arm bar leverage technique" to get Hita on the ground.  Stansell and another officer began to assist Richbourg, who says that Hita's father was pleading with Hita not to resist.  At this point, Hita's father told the officer that Hita recently had a shoulder injury.  Once Hita was on the ground, the officers secured his right wrist in a handcuff; however, Hita continued to resist by keeping his left arm underneath his body.  Eventually, Richbourg says, the officers were able to secure both of Hita's hands behind his back in handcuffs.  [Id.].

Stansell's Incident Report confirms Richbourg's account.  He apparently did not see what happened inside the apartment, but he says that Richbourg told him that when he stepped into the apartment, Hita stepped back and attempted to shut the door again, that Richbourg grabbed Hita's arm, and that Hita "bowed up" and would not allow Richbourg to handcuff him.  Once the two were outside, Stansell observed Richbourg struggling to detain Hita, and he went to assist.  He states that he gave Hita verbal commands to get down on the ground but Hita continued to resist.  He does not describe the maneuver which finally brought Hita to the ground but states that once Hita was down, he kept his left arm underneath his body and did not comply with commands to get his hands behind his back.  Hita was lying on his stomach, and Stansell says he feared Hita might have a weapon in his front waist band, so he grabbed Hita's thumb and forced his arm from underneath him.  This allowed the officers to get both of Hita's hands behind his back so that they could apply the handcuffs.  [Doc.

22, Ex. 1].

Officer T. Marshall, who is not named as a Defendant in this case, was also present at the time of Hita's arrest and submitted a Supplemental Report of the incident. Marshall says that he observed the door open and Hita stand in the doorway. He saw Richbourg enter the doorway, say something to Hita and place his hand on one of Hita's arms as if trying to handcuff Hita. He says that Hita pulled away, and then a struggle began between Richbourg and Hita. Marshall then rushed to the front door to assist, trailing behind Stansell. Marshall says that Richbourg struggled with Hita until they were both on the ground. The officers were trying to get Hita's hands behind his back as he was lying stomach-down on the ground. Marshall states that, as Stansell was assisting Richbourg, he grabbed Hita's left arm and pulled it behind his back so that Richbourg could secure Hita in handcuffs. [Doc. 22, Ex. 9].

Johnson wore a belt tape during the encounter with Hita and during the arrest. The recording of the actual moment of the arrest is garbled, with much scuffling and shouting apparent on the tape. At one point, Johnson asks Hita's father to tell Hita to quit fighting with the officers, and tells the father that Hita needs to cooperate with the officers, that Hita is making things worse. Hita's father can be heard saying, "Mijo [my son], go in the house now," and telling Hita to "settle down," "don't fight them," and "quit crying." Later on the tape, Hita, Sr. asks the officers, "Why do you have to treat him like that?" and even later says to the police, "I'm just very disappointed in the way you treated him, that's all . . . . I came in and he came out and you threw him on the ground and break his arm, that's just not right." [Doc. 22, Ex. 8].

Because Hita was complaining of pain in his shoulder, Stansell drove him to the hospital after the arrest. Medical records indicate that Hita sustained a sprain or strain to his arm. He was directed

to apply ice to the area for three days and to take Ibuprofen for pain, and to return for a recheck in one week. [Doc. 22, Ex. 10]. There is no documentation of any other medical treatment.

None of the officers explicitly denies Hita's allegation that the police continued to batter and beat him even after he was subdued. There is certainly nothing in the incident reports to this effect, although there are many statements from the officers that the struggle with Hita continued even after he was down on the ground. The officers state that Hita refused to comply with their requests to put his hand behind him, and that it would be justifiable for an officer to use reasonable force to pull an arrestee's arm out from under his body if the officer believed the arrestee might have a weapon concealed in his clothing.

The issue remains, however, whether the amount of force used was reasonably necessary to secure the scene. A jury could find that it was not reasonable for the officers to pull Hita outside and throw him forcefully to the ground, on his face, if he weren't resisting arrest. So, too, no reasonable jury would find that it was appropriate for police to beat a subdued subject. This is what Hita alleges occurred, and it creates a factual dispute which this Court cannot resolve on summary judgment.

The jury must determine whether Hita resisted reasonable efforts to handcuff him while he was still standing, and whether the officers acted reasonably in taking Hita to the ground and in the manner in which they performed this action, and whether, as Hita contends, they continued to beat him after he was subdued and posed no further threat to them or to his wife or other persons in the vicinity. Summary judgment cannot be granted in this circumstance. As one commentator noted:

> [F]actual disputes may preclude resolution of even the merits question. It may often be the case that the plaintiff and defendant have substantially different accounts of what happened. If that is the case, that factual dispute is just as likely to preclude the court from determining whether the plaintiff has properly asserted the violation

34

of a constitutional right as it is to preclude the resolution of whether
that right was clearly established . . . . [And] the second part of the
immunity inquiry – whether the defendant violated a constitutional
right that was clearly established at the time of [his conduct] . . . may
be impossible to answer if there are substantially disputed facts . . . .
[In determining the "clearly established law" question], the court
cannot assess whether the precedent gave fair warning to the
defendant until it determines whose version of the facts to believe.

Alan K. Chen, The Facts About Qualified Immunity, 55 Emory L.J. 229, 258-59, 261 (2006).

The Court denies summary judgment on the claim of excessive force by Stansell and
Richbourg.

In addition, the Court will deny summary judgment as to Hita's claim of battery under state
law against these two Defendants.  Battery by a law enforcement officer acting with the scope of his
duty is among the actions for which sovereign immunity is waived under the New Mexico Tort
Claims Act.  N.M.S.A. (1978) § 41-4-12.  In New Mexico, "[t]he elements of civil and criminal
assault and battery are essentially identical." State v. Ortega, 113 N.M. 437, 440, 827 P.2d 152, 155
(Ct. App. 1992).  The crime of battery is defined as "the unlawful, intentional touching or application
of force to the person of another, when done in a rude, insolent or angry manner."  N.M.S.A. (1978)
§ 30-3-4.  Thus, if the officers' touching of Hita was "unlawful," then civil liability will attach.  As
discussed above, there are factual disputes as to whether, *inter alia*, the officers continued to beat
Hita after he was subdued, and these factual disputes preclude a finding, as a matter of law, that the
touching was lawful.

However, this ruling does not preserve Hita's claim of municipal liability, because he did not
allege such liability in the complaint with respect to excessive force.  Hita's Second Cause of Action
is directed solely toward municipal liability for: (1) "creating an environment wherein police officers

are encouraged routinely to arrest citizens for 'obstruction,' when in fact no criminal act has taken place"; and (2) "inadequate training, supervision and discipline of its police officers, and police officers supervisors, with respect to the limits of their authority and the Constitutional prohibitions against warrantless entry into the homes of citizens, warrantless arrest, and the arrest of citizens without probable cause."  [Complaint, ¶48].  Hita does not claim that any inadequate training or supervision occurred with respect to police brutality, nor does he not allege any municipal policy which encouraged officers to apply excessive force.  Thus, the fact that summary judgment is denied with respect to the excessive force claims against the two individual officers does not preserve Hita's claim of municipal or supervisory liability, as that claim is worded in the Complaint.

<u>Fourth Cause of Action: Violation of Due Process Based on False Statements<br>and Prosecution Without Probable Cause</u>

In this claim, Hita alleges that Defendant Stansell initiated and pursued the criminal prosecution against him without probable cause, and knowingly made false statements of fact in the affidavit he executed in connection with the Criminal Complaint "in an attempt to embellish the facts in favor of a prosecution."  [Complaint, Doc. 1 at ¶ 54].  He also alleges that Stansell gave false testimony at trial consistent with the false statements in the affidavit, in aid of securing a conviction for crimes Hita did not commit.  Hita asserts that these actions violated his due process rights.

Stansell denies that he made any false statements and contends that there was probable cause to support the criminal prosecution.

The Court has already determined that probable cause existed for the arrest.  The Court now finds, as a matter of law, that the conduct of the prosecution was supported by probable cause.  The officers were justified in their belief that there was probable cause to charge Hita with battery on his

wife.  As noted above, the crime of battery on a household member is defined in part as "the unlawful, intentional touching or application of force to the person of a household member, when done in a rude, insolent or angry manner."  The statements of the neighbor as to the argument occurring outside and the apparent threats made by Hita toward his wife, coupled with her subdued and apparently cowed manner at the door and the fact that Hita would not allow her to speak to the officers on her own, as well as her statement that he grabbed her arm and the officers' perception that she had injuries on her arm and hand, taken together provide a strong basis to believe that Hita violated N.M.S.A. (1978) § 30-3-15.

Hita, however, points to the fact that the neighbor who reported the incident told the police that she witnessed the argument between the couple outside in the parking lot, and then saw the male go back into the house first, followed shortly thereafter by the female.  Hita argues that this information should have put Stansell on notice that the female had not been physically forced back into the house.  He further points out that no neighbor reported witnessing any assault or battery.

However, it was not the neighbor's statements alone that led Stansell to conclude there was probable cause to believe a battery had taken place.  Rather, the totality of the circumstances including, crucially, Hita's obstinately resistant behavior in the face of police requests that he allow them to see and speak to his wife, and her subdued demeanor and apparent inability to open the door and leave the house of her own free will, gave them ample cause to believe she was the victim of domestic abuse.  The marks on her arm and hand, and her statement that Hita grabbed her, were confirming evidence of the battery.

Hita contends that Johnson's statement that a neighbor told him the male shouted to the female that she could not leave with his baby, "were a complete fabrication."  [Doc. 30, at 9].

However, arguments of counsel do not suffice to raise an issue of fact.  Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 671-72 (10th Cir. 1998).  Hita has not supplied an affidavit of the neighbor, or any other evidence, to counter Defendants' statement that the information they had at the scene included reports of possible threats by Hita against his wife.

The Court finds that, as a matter of law, a reasonable officer considering the totality of the circumstances would have believed there was probable cause to charge Hita with battery upon a household member.

The evidence is also sufficient to establish probable cause that Hita violated N.M.S.A. (1978) § 30-22-1, which section is titled, "Resisting, evading or obstructing an officer."  The Criminal Complaint under which Hita was charged lists two separate offenses under this statute, "Obstructing a Police Officer" and "Resisting/Evading a Police Officer."  [Doc. 22, Ex. 12].  Although the record that has been supplied to this Court of the trial proceedings in the state Magistrate Court and that of the appeal in the state District Court is somewhat unclear, it appears that both parties agree that the Magistrate Court jury found Hita guilty of "Obstructing a Police Officer," and not guilty of "Resisting/Evading a Police Officer."  [See, Doc. 16, Exs. 2,3].  The District Court later reversed Hita's conviction on "obstructing," on ground he had been acquitted of "resisting/evading"; however, as noted above, the fact that a charge is dismissed or a conviction reversed on appeal is not determinative on the issue of whether a reasonable law enforcement officer would have thought there was probable cause to bring the charges in the first place.  Summers v. Utah, supra.

Hita contends that Stansell made false statements in the affidavit, and later testified falsely at trial.  He says that Stansell's statement that Hita used profanity toward him and the other officers was a "total fabrication."  [Doc. 30, at 10].  The belt tape does not cover the entire period of the

encounter and is inaudible in portions, but the tape does not establish any use of profanity by Hita. The Court finds, however, that the question of profanity is not material to the issue of whether the officers had probable cause to charge Hita with "resisting, evading or obstructing an officer."

The totality of the circumstances which the officers confronted at Hita's apartment, even if no profanity was used, would have led a reasonable officer to believe there was probable cause to charge Hita with a violation of § 30-22-1. It is undisputed that Hita refused to permit the officers to speak with his wife, outside of his presence. It is undisputed that, for a period of one to two hours, he refused all requests and commands that he come outside and talk to police officers, who informed him they'd had a report of an argument outside and were concerned for the welfare of a woman inside the apartment.

Hita could have defused the situation at any point during the standoff by simply coming outside, answering the officers' questions, and allowing them to see and speak to Suzanne in a way which would have enabled the officers to ensure that she was safe and unhurt. Although he claims he did not yell at the officers or use profanity, the belt tape reveals an agitated, angry and destructive Hita refusing to comply with the reasonable demands of the police officers.

The Court finds, as a matter of law, that Hita's behavior would have led a reasonable officer to believe there was probable cause to charge Hita with the crime of "resisting, evading or obstructing an officer," as defined in N.M.S.A. (1978) § 30-22-1. The Court further finds no genuine issue of fact with respect to the claim of false statements by Stansell, on matters that are material to resolution of this Cause of Action. Summary judgment is therefore appropriate as to the due process claim.

In his municipal liability cause of action, Hita alleges that the City "creat[ed] an environment wherein police officers are encouraged routinely to arrest citizens for 'obstruction,' when in fact no

criminal act has taken place"; and further alleges that the City failed to adequately train, supervise and discipline its officers "with respect to the limits of their authority and the Constitutional prohibitions against . . . the arrest of citizens without probable cause." [Complaint, Doc. 1, at ¶48].

He alleges in his First Cause of Action that Defendant Johnson failed to stop his subordinates from violating Hita's constitutional rights, when he knew or should have known that the subordinates "were acting without a warrant, without probable cause or even reasonable suspicion, and that their conduct violated the Constitutional rights of Eloy Hita." [Complaint, Doc. 1, at ¶ 45].

To the extent these allegations of municipal and supervisory liability can be seen to cover the claim that Stansell violated Hita's due process rights by securing a criminal complaint without probable cause, they too are subject to summary judgment based on the finding that probable cause existed, as a matter of law. <u>Hinton v. City of Elmwood</u>, *supra*, at 782 (without an underlying constitutional violation, there can be no municipal liability).

<u>Fifth Cause of Action: Malicious Abuse of Process under State Law</u>

Hita alleges in his Fifth Cause of Action that Defendant Stansell initiated criminal proceedings against him without probable cause, with a motive to punish Hita for exercising his constitutional rights and in order to cover up wrongdoing by the police officers, and that these actions constitute "malicious abuse of process" as defined by state law.

Under New Mexico law, the tort of malicious abuse of process is designed to offer redress to a plaintiff who has been made the subject of legal process improperly, where the action was wrongfully brought by a defendant merely for the purpose of vexing or injuring the plaintiff, and resulting in damage to the plaintiff's personal rights. <u>DeVaney v. Thiftway Mktg. Corp.</u>, 124 N. M. 512, 517, 953 P. 2d 277, 282 (1997). Malicious prosecution and abuse of process are torts for which

immunity has been waived under N.M.S.A. (1978) § 41-4-12, when committed by law enforcement officers while acting within the scope of their duties.[6]

The cause of action for malicious abuse of process under New Mexico law consists of the following elements:  (1) the initiation of judicial proceedings against the plaintiff by the defendant; (2) "an act by the defendant in the use of process other than such as would be proper in the regular prosecution of the claim"; (3) a primary motive by the defendant in misusing the process to accomplish an illegitimate end; and (4) damages.  "In short, there must be both a misuse of the power of the judiciary by a litigant and a malicious motive."  DeVaney, *supra*, 124 N. M. at 518. The tort of malicious abuse of process is not favored in the law and is construed narrowly.  Id., at 519.

As discussed above, Defendants had probable cause to bring criminal charges against Hita for violations of two criminal statutes.  Aside from his allegation of lack of probable cause, Hita does not allege any other "act by the defendant in the use of process other than such as would be proper," and the record does not reveal any.  There is not material issue of fact as to false statements.  Thus, plaintiff cannot establish this element of the cause of action, and "[i]n pursuing a tort claim of malicious abuse of process, a plaintiff's failure to prove any one of its elements would be fatal to his or her claim."  Weststar Mortgage Corp. v. Jackson, 133 N.M. 114, 125, 61 P.3d 823, 834 (2002).

Summary judgment is appropriate as to this Cause of Action.

<u>Sixth Cause of Action:  False Arrest/Imprisonment under State Law</u>

Hita asserts a state law claim for false arrest and false imprisonment against Defendants Stansell, Richbourg and Johnson.  False arrest and false imprisonment are torts for which immunity

---

[6]These two torts were combined into the unitary cause of action for "malicious abuse of process" in the 1997 DeVaney decision.

is waived under N.M.S.A. (1978) § 41-4-12, if committed by law enforcement officers while acting within the scope of their duties.

New Mexico law is sparse with regard to civil liability for false arrest and false imprisonment. However, there can obviously be no "false arrest" if there was probable cause to make the arrest. The Court having found as a matter of law that there was probable cause for Hita's arrest, both with respect to battery upon a household member and as to resisting, evading or obstructing an officer, summary judgment is granted with respect to the claim of false arrest.

Under New Mexico law, the tort of false imprisonment requires that there be evidence or a reasonable inference of unlawful interference with the personal liberty or freedom of locomotion of another. Martinez v. Sears, Roebuck & Co., 81 N.M. 371, 373, 467 P.2d 37, 39 (Ct. App. 1970). "The act of confining or restraining another against his will constitutes false imprisonment when done with a knowledge of an absence of authority." State v. Muise, 103 N.M. 382, 388, 707 P.2d 1192, 1198 (Ct. App. 1985). And "a common-law defense to a civil wrongful arrest or a false imprisonment suit . . . requires only that the officer prove that he or she acted in good faith and with probable cause and therefore lawfully under the circumstances." State v. Johnson, 122 N.M. 696, 701-02, 930 P.2d 1148, 1153-54 (1996).

There is no allegation that the Defendant police officers were without authority to arrest and detain Hita, and the Court has already found that the officers reasonably believed they had probable cause to detain Hita, both in light of information indicating he had committed criminal offenses, and also in order to complete their task of ensuring that Suzanne Hita was safe and unharmed. Probable cause supplies the defense to these state law claims. Summary judgment is therefore appropriate as to Plaintiff's Sixth Cause of Action.

<u>Seventh Cause of Action: Battery under State Law</u>

As discussed above under the Fourth Cause of Action, the Court finds that factual disputes preclude summary judgment on the state law claim against Stansell and Richbourg for battery.

In addition, Hita asserts a claim that the City is liable under the doctrine of *respondeat superior* for any torts established against the individual officers.  [Complaint, Doc. 1, at ¶ 9].  This claims also survives summary judgment, with respect to the allegation of battery.

<u>Eighth Cause of Action:  Breaking, Entering and Trespass under State Law</u>

In the final claim of his Complaint, Hita alleges that Defendants Stansell and Richbourg invaded his privacy and committed the torts of trespass and breaking and entering when they entered the patio area of his apartment and damaged the fence, and when they broke the handle to his front door.  [Complaint, Doc. 1, at ¶66].

Property damage resulting from "violation of property rights" is one of the acts for which immunity is waived when committed by law enforcement officers while acting within the scope of their duties.  N.M.S.A. (1978) § 41-4-12.

Defendants' position is that they had a right to be on Hita's property because they were dispatched to the scene of a domestic dispute and had a duty to investigate a report of possible criminal activity.  Further, they assert they had a right to remain there, because upon their arrival Hita unreasonably refused to speak to them and refused to allow them to speak to his wife outside his presence.  The Court agrees.  The officers' entry was not unlawful, as discussed above in the section on unreasonable search and seizure.   As the New Mexico Supreme Court noted in  <u>Romero v. Sanchez</u>, 119 N.M. 690, 693, 895 P.2d 212, 215 (1995):

The trial court properly dismissed the trespass, assault, false

43

imprisonment, unlawful detention, and burglary and larceny claims because Sanchez did not violate the law.  The facts demonstrate that Officer Sanchez had a right to be on Romero's property.  As a police officer, Sanchez had a duty to be a "conservator[ ] of the peace." NMSA 1978, § 29-2-18(A) (Repl.Pamp.1994).  Officer Sanchez was dispatched to the scene of a private dispute . . .  Based upon [the facts confronting him at the scene], Officer Sanchez had a duty to investigate further, *see* NMSA 1978, § 29-1-1 (Repl.Pamp.1994) (stating that every peace officer has a duty to investigate all criminal violations), as well as a continuing duty to preserve the peace.  Hence summary judgment as to Romero's criminal trespass claim was appropriate as a matter of law.

Summary judgment will be granted with respect to Hita's Eighth Cause of Action.

## **Order**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment is denied in part, with respect to Plaintiff's Fourth Cause of Action (excessive force in violation of his federal constitutional rights) and Plaintiff's Seventh Cause of Action (battery under state law), as well as the claim for *respondeat superior* liability against the City of Clovis as the employer of Stansell and Richbourg with respect to the state law claim for battery.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment is granted in part with respect to all other claims, which are hereby dismissed from this action, including all claims against the City of Clovis based on municipal liability under Section 1983.

IT IS FURTHER ORDERED that, all claims against him having been resolved by this Order, Defendant Richard Johnson is hereby dismissed from the action.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge